# IN THE SUPREME COURT OF IOWA

No. 09–0338

Filed July 23, 2010

**STATE OF IOWA,**

Appellant,

vs.

**JEFFREY ALAN FISCHER,**

Appellee.

---

Appeal from the Iowa District Court for Hancock County, John S. Mackey, Judge.

Interlocutory appeal from a decision by the district court granting a motion to suppress the results of a breath test. **REVERSED AND REMANDED.**

Thomas J. Miller, Attorney General, Karen Doland, Assistant Attorney General (until withdrawal), and then Bridget A. Chambers, Assistant Attorney General, and Karen R. Kaufman Salic, County Attorney, for appellant.

R.A. Bartolomei of Bartolomei & Lange, PLC, Des Moines, for appellee.

**CADY, Justice.**

In this appeal, we must decide if a law enforcement officer can use a computer screen to make a "written request" to withdraw a bodily substance for testing from a driver suspected of operating while intoxicated. We conclude a computer screen satisfies the statutory requirement of a "written request." We reverse the decision of the district court and remand the case for further proceedings.

## I. Background Facts and Proceedings.

On October 6, 2008, at approximately 7:40 a.m., State Trooper Joseph Scott stopped a vehicle driven by Jeffrey Alan Fischer in Crystal Lake, Iowa, because Fischer was not wearing his seat belt. After coming into contact with Fischer, Trooper Scott made several observations leading him to conclude that Fischer had been drinking alcohol prior to driving. Trooper Scott placed Fischer under arrest and transported him to the Hancock County Sheriff's Office.

At the sheriff's office, Trooper Scott used the laptop from his car to complete the processing of the arrest using the Traffic and Criminal Software (TraCS) program.[1] The laptop monitor displayed the form Trooper Scott was completing, entitled "Request and Notice Under Iowa Code Chapter 321J/Section 321.208," also referred to as "Form MOWI." The laptop was also connected to the DataMaster breath test machine located at the sheriff's office. Trooper Scott sat in front of the computer screen while Fischer sat to Trooper Scott's right approximately three to

---

[1]TraCS is a program that is on the computers used in patrol cars in the state of Iowa. The program contains different types of forms necessary for patrol officers, including tickets, warnings, commercial motor vehicle inspections, and OWI paperwork. Trooper Scott testified that he received extensive training on the system and uses it every day. Trooper Scott also testified that the OWI report form on the TraCS system containing the request for specimen at issue in this case is the same as the printed forms.

four feet from the computer screen. The computer screen faced Trooper Scott. He testified at the hearing that the screen was not hidden or shielded from Fischer as he implemented the implied-consent procedures. In implementing the procedures, Trooper Scott read Fischer the "Implied Consent Advisory" from the computer screen. He next read Fischer the "Request for Specimen," also displayed on the computer screen. The request contained the following language: "Having read to you the appropriate implied consent advisory, I hereby request a specimen of your <u>Breath</u> for chemical testing to determine the alcohol or drug content." The trooper had checked the box on the computer screen indicating he was requesting a breath sample rather than a blood or urine sample and had inputted the date and time. The trooper then prompted the appearance of a pop-up window of text on the screen of the laptop in front of him.

The pop-up window did not consume the entire computer screen and contained an enlargement of the text following the "Request for Specimen" language from the form the trooper was completing. The form remained in the background of the screen while the pop-up window was active. The text in the window read: "Having been read the Implied Consent Advisory, I . . . to submit to the withdrawal of the specimen(s) requested." Two boxes and a signature line also appeared in the window following the text. The first box was labeled "consent," and the second box was labeled "refuse." Using a stylus, Fischer checked the box marked "consent" on the touch screen laptop monitor and signed his name. After checking the box, the word "consent" appeared to fill in the textual space between "I" and "to submit." Fischer's decision to consent to a breath test and his signature were instantly recorded and appeared within the form after the pop-up window disappeared.

After Fischer checked the box next to "consent" and signed his name, Trooper Scott took a sample of Fischer's breath using the DataMaster. The test reported a blood-alcohol level of .157. The trooper completed the form by signing and dating the form on the screen to certify the form's truth and accuracy. Trooper Scott testified a driver is able to withdraw consent to a breath test prior to administration of the test, but after the breath test is complete the information entered in the form on the computer becomes permanent. Fischer was not given a printed version of the "Request for Specimen" before the breath test was administered.

Fischer was charged with operating while intoxicated, second offense. He filed a motion to suppress his breath-test results, alleging the TraCS system's electronic version of the form containing the "Request for Specimen" did not meet the "written request" requirement of Iowa Code section 321J.6(1) (2007). The district court granted the motion to suppress Fischer's breath-test results. The court determined Trooper Scott did not comply with the "written request" requirement because neither the computer screen he used to read the pertinent request nor a paper copy of the form was shown to Fischer prior to the administration of the test. The State sought, and we granted, discretionary review of the district court ruling.

## II. Standard of Review.

The district court granted Fischer's motion to suppress based on its interpretation of Iowa Code section 321J.6(1). We review a district court's decision to grant a motion to suppress based on its interpretation of a statute for errors at law. *State v. Stratmeier*, 672 N.W.2d 817, 820 (Iowa 2003).

### III. Overview of Iowa Implied-Consent Law.

It has been a crime to operate a motor vehicle while intoxicated in Iowa since 1911. *See* 1911 Iowa Acts ch. 72, § 24 (codified at Iowa Code § 1571–m23 (Supp. 1913)). Since that time, the operating-while-intoxicated laws have evolved in a number of ways, including the adoption of the implied-consent procedure based on the premise that persons who drive vehicles are deemed to consent to a chemical test to determine the alcohol or drug content of their blood when reasonable grounds exist to believe they were driving while intoxicated. Rachel Hjelmaas, Legislative Services Agency, *Legislative Guide to Operating While Intoxicated (OWI) Law in Iowa* 1 (2007), *available at* http://www.legis.state.ia.us/Central/Guides/OWI.pdf. The underlying rationale of the law is that the operation of a motor vehicle on public streets is a privilege, not a right, subject to reasonable regulation. Tina Wescott Cafaro, *Fixing the Fatal Flaws in OUI Implied Consent Laws*, 34 J. Legis. 99, 102 (2008) [hereinafter Cafaro]. Thus, under the implied-consent law, drivers impliedly consent to submit to chemical testing "in return for the privilege of using the public highways." *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980).

In 1953, New York became the first state in the nation to enact an implied-consent law.[2] Cafaro at 103 & n.25 (referring to codified version of New York's implied-consent law, N.Y. Veh. & Traf. Law § 1194 (McKinney 2001) (originally enacted by L. 1953, c. 854)). The concept

---

[2]The concept of implied consent was conceived after prosecutors began using chemical-test evidence in the 1940s to convict impaired drivers and scientific instruments to measure blood alcohol content started to emerge as an alternative to the withdrawal of blood as a method to scientifically detect the presence of alcohol in the body. Cafaro at 102. The first stable instrument for measuring blood alcohol from a breath sample, the Drunkometer, was invented in 1938. *Id.* at 103 n.24. The Breathalyzer brand was invented in 1954. *Id.*

was first proposed in Iowa in 1957 when a bill modeled after the New York statute was introduced in the House of Representatives. H.F. 257, 57th G.A., Reg. Sess., Explanation of House File 257 (Iowa 1957) (stating the bill is "patterned after the New York statute, which was enacted a few years ago, but is an improvement on this earlier legislation").

The procedures were subsequently introduced in the Senate and enacted by the General Assembly in 1963.[3] *See* S.F. 437, 60th G.A., Reg. Sess. § 34 (Iowa 1963); 1963 Iowa Acts ch. 114, §§ 36–50 (codified at Iowa Code ch. 321B (1966)). The implied-consent procedures were originally enacted as a part of an overall administrative effort to regulate the control, sale, and use of alcohol and were not included as an organic part of the 1966 criminal operating while intoxicated (OWI) laws. *See* 1963 Iowa Acts ch. 114 (entitled "Liquor Control, Sale and Use"). The General Assembly declared its policy in enacting chapter 321B was "to control alcoholic beverages and aid the enforcement of laws prohibiting operation of a motor vehicle while in an intoxicated condition." Iowa Code § 321B.1 (1966). Thus, although enacted and codified separately from the criminal OWI chapter, the legislature intended for the section to have an administrative effect as well as aid in the enforcement of OWI laws. In 1986, the implied-consent statutes from chapter 321B were combined with the criminal OWI laws. 1986 Iowa Acts ch. 1220 (codified at Iowa Code ch. 321J (1987)). The chemical test results and refusals

---

[3]In 1967, the Secretary of Transportation began to issue national uniform standards for highway safety programs throughout the country. *See* Cafaro at 104. The programs were aimed at reducing traffic accidents due to persons driving while under the influence of alcohol and included an implied-consent law. *Id.* By 1992, implied-consent laws were enacted in all fifty states and the District of Columbia. *Id.*

are used today both for license revocation and for OWI criminal prosecutions. *See* Iowa Code §§ 321J.2, .12 (2009).

Although the implied-consent law is based on the premise that all drivers consent to the withdrawal of a body substance for testing if suspected of driving while intoxicated, the law is tempered by giving drivers the right to withdraw this implied consent and refuse the test. *State v. Massengale*, 745 N.W.2d 499, 501 (Iowa 2008); *see also* Iowa Code § 321J.9 (prohibiting a chemical test after a driver has refused the officer's request). Thus, the consent for a chemical test must ultimately be "freely made, uncoerced, reasoned, and informed." *State v. Garcia*, 756 N.W.2d 216, 220 (Iowa 2009). This voluntariness requirement is captured by Iowa Code section 321J.8, which requires law enforcement officers to advise suspects of all the consequences of a decision to submit or refuse testing. *See id.* (recognizing section 321J.8 sets out a voluntariness requirement and that consent is involuntary and invalid if a driver is not reasonably informed of the consequences of refusal). Viewing the advisory as an informational component in the procedure, we adopted a reasonableness standard for the methods to be used by law enforcement officers to convey the advisory. *Id.* at 222.

Pursuant to the implied-consent procedure, an officer who has reasonable grounds to believe a driver is operating a vehicle while intoxicated must first make a written request to withdraw the driver's blood, urine, or breath to determine the specific concentration of alcohol. Iowa Code § 321J.6(1). Although not contained in the New York statute used as a model for Iowa's implied-consent law, the current "written request" requirement was a part of Iowa's original statute, Iowa Code § 321B.3 (1966), and requires that "[t]he withdrawal of the body substances and the test or tests . . . be administered *at the written*

*request of a peace officer* having reasonable grounds to believe that the person was operating a motor vehicle" while intoxicated, Iowa Code § 321J.6(1) (2007) (emphasis added).

Our earlier decisions in *Gottschalk v. Sueppel*, 258 Iowa 1173, 140 N.W.2d 866 (1966); *State v. Richards*, 229 N.W.2d 229 (Iowa 1975); and *State v. Meissner*, 315 N.W.2d 738 (Iowa 1982), stand today as our primary interpretations of the statutory "written request" requirement. We have held that an oral request by an officer, followed by a written request after the test has been administered, is not sufficient. *Richards*, 229 N.W.2d at 233. We have also held that "written request" does not require the driver be in physical possession of the writing itself and that the writing serves as a record of the request. *Meissner*, 315 N.W.2d at 740–41; *Gottschalk*, 258 Iowa at 1183, 140 N.W.2d at 872. Furthermore, after a written request is properly given to the driver, a finding that the test has been refused is premised on the statements and conduct of the arrestee and police officer, as well as on all the surrounding circumstances. *Ginsberg v. Iowa Dep't of Transp.*, 508 N.W.2d 663, 664 (Iowa 1993).

If a driver refuses the chemical testing under the implied-consent procedure, the officer sends the department of transportation a certified, sworn report that the officer had reasonable grounds to believe the person was driving while intoxicated and that conditions existed to perform a chemical test under section 321J.6. Iowa Code § 321J.9(1). The refusal to submit to an officer's request for a specimen sample will then result in automatic revocation of the driver's license for one year if it is the driver's first offense. *Id.* § 321J.9(1)(*a*). If the driver submits to the chemical testing and the test shows a concentration of alcohol in excess of the legal limit, the driver's license will be revoked for 180 days if it is

the driver's first offense. *Id.* § 321J.12(1)(*a*). Of course, the driver may appeal the revocation by challenging the process on a number of statutory grounds at a hearing before the department. *Id.* § 321J.13(2)(*a*)-(*c*).

### IV. Interpretation of Written-Request Requirement.

The broad issue presented in this appeal is whether the use of a computer screen, rather than a paper document, to make the request for withdrawal of a bodily substance for testing satisfies the statutory "written request" requirement of the implied-consent statute. We begin our resolution of this issue with the simple recognition that our legislature has specifically defined "written" in the chapter on general rules of statutory construction. We recognize the legislature "may act as its own lexicographer." *Henrich v. Lorenz*, 448 N.W.2d 327, 332 (Iowa 1989). When it does so, we are normally bound by the legislature's own definitions. *Inter-State Nurseries, Inc. v. Iowa Dep't of Revenue*, 164 N.W.2d 858, 861 (Iowa 1969).

> In relevant part, the legislature's rules of construction provide:
>
> In the construction of the statutes, the following rules shall be observed, *unless such construction would be inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute*:
>
>    . . . .
>
> 39. *Written—in writing—signature.* The words "*written*" and "*in writing*" may include any mode of representing words or letters in general use, and include an electronic record as defined in section 554D.103.

Iowa Code § 4.1(39) (first emphasis added).

In turn, "electronic record" is defined as any record "created, generated, sent, communicated, received, or stored by electronic means." *Id.* § 554D.103(7). Although section 554D.103 was enacted as part of the laws affecting commerce, its reference in the general definition section of

the Code reflects a clear intention of our legislature for the meaning of "writing" to continue to evolve to recognize the realities of our information age. In a rare articulation of legislative purpose, the General Assembly wrote, in relevant part:

> It is the intent of the general assembly in enacting this chapter to effectuate all of the following purposes:
>
> . . . .
>
> 3. Facilitate electronic filing of documents with state and local government agencies and promote efficient delivery of government services by means of reliable electronic records.
>
> . . . .
>
> 5. Promote public confidence in the integrity, reliability, and legality of electronic records . . . .

2000 Iowa Acts ch. 1189, § 2 (codified at Iowa Code § 554D.102 (2003)). The section was later repealed without explanation in 2004, 2004 Iowa Acts ch. 1067, § 10, but the legislature retained the provisions from 2000 relating to discretionary governmental use of electronic records, 2000 Iowa Acts ch. 1189, §§ 19, 20 (codified at Iowa Code §§ 554D.119, .120 (2007)). Additionally, the fiscal note prepared for the 2000 legislation indicates part of the purpose behind the enactment of the statute was to reflect current government spending on technology from the general fund. *See* H.F. 2205 Fiscal Note, 78th G.A., Reg. Sess. (Iowa 2000).

Consequently, the statutory definition of the word "written" is an important consideration in our resolution of whether a computer screen can be used to satisfy the statutory "written request" requirement. Clearly, the word "written" means any mode of representing words and includes a record "communicated . . . or stored by electronic means." Iowa Code § 554D.103(7). The word "written" plainly includes words on a computer screen under the definition provided by the legislature. Nevertheless, our inquiry does not end with the statutory definition. As

directed by our legislature, the rules and definitions set out in section 4.6 do not apply if "inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute . . . ." Iowa Code § 4.1; *see also State v. Hopkins*, 465 N.W.2d 894, 896 (Iowa 1991) ("Second, we look beyond the ordinary meaning of the statutory language when a statute's literal terms are in conflict with its general purpose."). We must, therefore, consider whether a construction of "written request" that includes a computer screen would be inconsistent with the intent of the legislature or repugnant to the context of the statute.

The legislature did not specifically articulate a purpose for the "written request" requirement under the implied-consent law. We have, however, explored the role of the "written request" requirement within the Act as a whole in our prior cases. *See State v. Charlson*, 261 Iowa 497, 502, 154 N.W.2d 829, 831 (1967) ("[I]t is fundamental that in arriving at the correct interpretation of any particular provisions of the [implied-consent] Act and the intention of the legislature as expressed therein courts should consider the entire Act and, so far as possible, interpret its various provisions in the light of their relation to the whole."). Several helpful considerations can be derived from these cases.

We have found the written request requirement for the withdrawal of a bodily substance for testing to be "procedural, rather than substantive in character." *Charlson*, 261 Iowa at 505, 154 N.W.2d at 833 (referring to section 321J.6 at its previous designation in section 321B.3 in the 1966 Code). The written-request requirement is one of numerous procedural requirements found in section 321J.6. *See* Iowa Code § 321J.6(1)(*a*)-(*g*). Each requirement has separate, but related, purposes. In *State v. Schlemme*, we found the broad purpose of the procedural requirements of the Act were "to protect the health of the

person submitting to the test and to guarantee the accuracy of the test for use in judicial proceedings." 301 N.W.2d 721, 723 (Iowa 1981). More specifically, we have indicated "[t]he primary purpose of the request [requirement] is 'to provide a record of the relevant communication for subsequent review.'" *State v. McCoy*, 603 N.W.2d 629, 630 (Iowa 1999) (quoting *Henry v. Iowa Dep't of Transp.*, 426 N.W.2d 383, 387 (Iowa 1988)) (holding the procedural requirement of a written request was sufficient, even when an officer asked for a breath sample and inadvertently checked the box next to blood sample on the form, and the record clearly shows the driver understood the real sample being requested was breath); *see also Meissner*, 315 N.W.2d at 741 ("[T]he writing provides a record of the relevant communication. This promotes accuracy and furnishes a record for subsequent review."). This written "record" is important for trial because an involuntary chemical test is not admissible in criminal proceedings. *See Charlson*, 261 Iowa at 506, 154 N.W.2d at 834 (highlighting importance of properly obtaining consent prior to test). Moreover, the record must show the request was administered prior to the test, not contemporaneously with or following the test as a formality. *See State v. Richards*, 229 N.W.2d 229, 233 (Iowa 1975) (rejecting State's argument that the written request may follow the test and "ratif[y] what had been done").

In past cases, the purpose of the "written request" requirement in section 321J.6(1) was often tied to the advisory given to inform a suspected drunk driver of the consequences of submitting to or refusing a chemical test to enable the driver to make an educated decision under section 321J.8. However, this integration of the two sections was a result of law enforcement practice, not legislative policy. For example, the "written request" in *Meissner* also contained language of advisory,

stating " '*I have been informed that my driver's license for privilege to operate a motor vehicle will be revoked* for failing to provide a specimen of a specified body substance for chemical testing,' " *Meissner*, 315 N.W.2d at 740 (quoting text of request given to defendant) (emphasis added), and the advisory in *Gottschalk* "plainly stated that a refusal to submit to a chemical test would result in a revocation of plaintiff's driver's license for a period of 120 days to a year." 258 Iowa at 1175, 140 N.W.2d at 867. Although it may seem intuitive to make a more detailed record of the transaction by documenting the advisory within the signed request, this is not statutorily required. Only the request needs to be in writing. As a result, the policies behind the two separate procedural requirements can be more clearly articulated: the advisory is meant to inform the driver of the consequences to enable fair opportunity for decision making while the written request requirement ensures an accurate and reliable record that a pretest request was made.

Having identified the purpose of the "written request" requirement, we turn to consider whether the use of a computer screen as the writing would contravene the intent of the legislature in making the requirement a part of the implied-consent law. As a general proposition, we recognize our society is in the midst of a transformation to paperless commerce and interaction between people. This transformation is even observable in Iowa's court system, which has begun the process of becoming a totally paperless system. Additionally, many of our rules have been modified to accommodate the use of computers to store and communicate information. The paper-laden world of yesterday will be much different tomorrow. This transformation is largely based on the ability of computers to maintain accurate and reliable records, perhaps better in many ways than paper.

In particular, the "TraCS system" used by Trooper Scott is "a sophisticated data collection and reporting tool for the public safety community to streamline and automate the capture of incident data in the field and transfer the data from the local agency to a statewide enterprise system." Iowa Dep't of Transp., TraCS, *History of the National Model*, http://www.iowatracs.us/About/NationalModel.aspx (last visited July 16, 2010). Moreover, some of the cited benefits of recording data at the point of origination are improvements in accuracy, completeness, and timeliness, in part because the system eliminates the need for duplicate entries in local and state databases. *Id.* The system also facilitates a greater electronic network within the State of Iowa: TraCS enables electronic filings with and data transfers to the courts. *Id.* Thus, the system used in this case is not only consistent with the legislature's purpose for written requests in OWI cases, it also appears to affirmatively support it. Because using an electronic form of the written request for a breath sample does not conflict with the legislative purpose behind the requirement in section 321J.6(1), we apply the definition of "writing" in section 4.1(39) and allow the use of the electronic form to meet the statutory requirement.

Notwithstanding, Fischer more specifically argues that the purpose of the "written request" requirement is broader than to merely maintain accurate and reliable records. He asserts the requirement also exists to allow a driver to view the request before making the decision to consent to give a sample or refuse to give a sample and that the manner in which the computer screen was used in this case, in conjunction with the way the program operated, did not allow him to view the entire "written request." In particular, Fischer asserts the use of a computer screen does not allow a driver to view the entire electronic record prior to signing

the signature line on the pop-up window. In this way, he claims the use of the computer as a writing frustrates the purpose of the "written request" requirement of the rule.

The record in this case revealed the written request portion of the implied-consent procedures existed on the computer screen, but in small font and at an angle from Fischer. The form on the screen was a work in progress, requiring Fischer's signature and selection of "consent" or "refuse" on the "Request for Specimen" section of the form, along with several unrelated inputs by the officer, before the form was "locked" in its final version. Yet, the only portion of the "Notice and Consent" form at issue in the case is the specific section requesting a specimen of the driver's breath. The request itself is the only portion that is statutorily required to be in writing and signed by the driver prior to administration of the test. *See* Iowa Code ch. 321J. It is undisputed that the relevant request existed in writing on the computer screen at the time Fischer signed the form. Moreover, the purpose of the "written request" requirement is not as broad as claimed by Fischer. It is irrelevant that a driver does not see the entire "Request and Notice" form because the statute does not require the entire form to be given to or observed by a driver prior to the test. The only component of the overall form required to be "in writing," as it pertains to a driver, is the "Request for Specimen."

Fischer narrows his argument even further by asserting the statute required the law enforcement officer in this case to make an affirmative effort to draw his attention to the form that appeared on the computer screen, so he could have reviewed it for himself to provide a better opportunity for his decision making. However, the written-request requirement of section 321J.6(1) is not concerned with providing information to a driver to assist in assessing the available options under

the implied-consent law. Additionally, the language of the request provides no alternative options for the driver to assess. Instead, the relevant text simply recites a summary of the request that was made by the officer. The policy behind Fischer's concern for adequate mechanisms to enable informed decision making is reflected within the other procedural requirements of the implied-consent law that clearly express this intention. *See, e.g.,* Iowa Code §§ 321J.6(1) (reasonable suspicion prerequisite), 321J.8 (statement of consequences of implied consent); *see also Garcia*, 756 N.W.2d at 222 (reasonable methods must be used to convey the advisory to "provid[e] the accused driver a basis for evaluation and decision-making"); *Voss v. Iowa Dep't of Transp.*, 621 N.W.2d 208, 211–12 (Iowa 2001) (stating the clearly articulated purpose of the implied-consent advisory is to benefit the driver).[4]

We do not read a requirement into a statutory scheme when none exists because "[i]t is not our province to write such a requirement into the [implied consent] statute." *Gottschalk*, 258 Iowa at 1183, 140 N.W.2d at 872. Further, the written request need not be given to the driver for an opportunity to read it because the purpose is to create a record of the relevant communication; such a record can be created with the driver's participation, but the driver's permission to create or finalize the record is not contained in section 321J.6(1). *See id.* ("[T]he statute does not provide that the written request of the officer for a chemical test be handed or given to the arrested motorist or served upon him in the

---

[4]Fischer does not argue the officer failed to make a request for a breath test prior to administration of the test, a requirement that is implicit in the statute and made explicit in our prior cases. *See Richards*, 229 N.W.2d at 233 ("The statute requires the request to precede submission to the test."). He also does not claim he gave an equivocal response that constituted a refusal to the test, but was subjected to the test anyway. Such allegations would produce concerns over the accuracy of the written record and would be resolved by reference to other relevant extrinsic evidence.

manner of an original notice commencing a civil action."). The request must certainly exist in writing prior to the administration of the test, but the purpose of section 321J.6(1) is to record the request, not to provide notice of what was orally requested or an opportunity to alter the document. We hold an electronic version of the written request satisfies the requirement of section 321J.6(1). The request need not be printed for the driver in order for the request to be adequately "written." The written-request requirement of section 321J.6(1) is satisfied by the use of a computer screen. Additionally, we hold the officer does not need to call the driver's attention to the request that appears on the screen for the request on the screen to satisfy the definition of "written." The use of a document appearing on a computer screen is consistent with the legislative intent of the requirement and conforms to the context of the statute.

We also recognize that electronic forms may be altered until they are permanently saved. This is an improvement over the prior practice of discarding paper in mass quantities when a mistake or change of heart occurs in order to start over on a fresh page. The nature of computerized documents allows for changes in documents without the consequence of producing additional waste. This technological reality does not affect our decision that, although alterable on the same screen, documents on a computer constitute a "writing" for purposes of section 321J.6(1).

**V. Conclusion.**

We have considered all the claims raised on appeal. We reverse the decision of the district court and remand the case for further proceedings.

**REVERSED AND REMANDED.**